# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **GERRY BENITEZ and** | : | |
| **JOSE RODRIGUEZ** | : | |
| **Plaintiffs** | : | **No. 3:16-cv-00793(VLB)** |
| | : | |
| **v.** | : | |
| | : | **March 30, 2020** |
| **JARVIS AIRFOIL, Inc.** | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 70]

Before the Court is the Defendant, Jarvis Airfoil, Inc.'s ("Jarvis"), motion for summary judgment [Dkt. 70] as to Plaintiff Gerry Benitez and Jose Rodriquez's claims for racial discrimination (both plaintiffs), constructive discharge (Mr. Benitez only), and retaliation (Mr. Rodriguez only) brought under 42 U.S.C. § 1981. For reasons set forth herein, the Court DENIES Defendant's motion for summary judgment.

## Procedural background

Before considering the merits of Defendant's motion, a brief discussion of the procedural history of this matter is warranted. The complaint was initially filed on May 23, 2016, against the Defendant and several of its current and former employees. [Dkt. 1 (Compl.)]. Defendant then moved to partially dismiss the Complaint. [Dkt. 18 (Def. Mot. to Dismiss)]. In response to the motion to dismiss, Plaintiff consented to the dismissal of all claims for negligent infliction of emotional

1

distress ("NEID"), Mr. Benitez's intentional infliction of emotional distress ("IIED") claim against Al Leeman, and Mr. Rodriguez's IIED claims against Mr. Leeman, Haitham Taha, Jean Misorski, and Stella Teller. [Dkt. 36 (Order Granting Mot. to Dismiss) at 2-3.]. In July 2017, the Court (Squatrito, J) dismissed Plaintiff's Title VII claims and IIED claims as pled against the individual defendants, noting Plaintiffs' desire to amend their statutory claims to bring them under § 1981. [*Id.* at 10.]

Plaintiffs filed their Amended Complaint on September 1, 2017, alleging that Jarvis Airfoil, Inc. discriminated against the Plaintiffs based on their ancestry and ethnic characteristics by subjecting them to a racially hostile work environment in violation of § 1981. [Dkt. 42 (Am. Compl.) ¶ 85]. As stated above, Mr. Benitez separately alleges constructive discharge and Mr. Rodriguez separately alleges retaliation, both brought under § 1981. [*Id.* ¶¶ 86-87.]. Plaintiffs did not replead any Title VII or IIED claims, nor any claims against individual defendants. [*Id.*].

The parties bitterly contested their respective compliance with their discovery obligations. *See, e.g.* [Dkt. 62 (Pl. Mot. to Strike, Compel, and Impose Sanctions)]*; see also* [Dkt. 86 (Def. Opp'n. Pl. Second Mot. to Compel and Cross-Mot. for Sanctions)]. The Court admonished the parties for their apparently lacking efforts to resolve the discovery disputes. [Dkt. 69]. Defendant then filed the instant motion for summary judgment on September 14, 2018. [Dkt. 70]. Plaintiffs sought additional time to file their opposition memorandum, citing unresolved discovery disputes. [Dkt. 79 (Pl. Mot. for Recons. of Order re: Scheduling)]. Thereafter, Plaintiffs filed their memorandum in opposition of summary judgment arguing, *inter alia*, that Defendant refused to cooperate in discovery regarding the

Defendant's knowledge of the harassment or the discipline of two of the harassers, warranting consideration under Fed. R. Civ. P. 56(d). [Dkt. 82 (Pl. Mem. in Opp'n. Def. Mot. Summ. J)]. Plaintiff also filed a second motion to compel. [Dkt. 81]. After cross-motions for sanctions, the Court once again ordered the parties to confer in good faith. [Dkt. 90]. After supplemental briefing by the parties, the Court granted Plaintiff's motion in part [Dkt. 97], ordering the production of documents for *in camera* review, ordered defense counsel to certify compliance pursuant to Fed. R. Civ. P. 26(g), and ordered Defendant to respond to interrogatories and requests for production set out in the Order.

On October 1, 2019, the Court granted Plaintiffs' motion for an extension of the deadline to seek permission to supplement their opposition to Defendant's summary judgment motion as a result of the exchange of additional discovery materials. [Dkt. 102]. Then, in November 2019, the Court granted Plaintiff's requested stay of the deadline to supplement their opposition to Defendant's summary judgment motion because the Court had not yet addressed Defendant's asserted claim of attorney-client privilege. [Dkt. 118]. On December 6, 2019, Judge Richardson addressed the remaining discovery disputes, except the asserted claim of attorney client privilege, and ordered responses by December 20, 2019. [Dkt. 119]. Shortly after, the case was transferred to this Court. [Dkt. 122]

On February 5, 2020, the Court granted Plaintiff's motion to compel production of the documents subject to *in camera* review. [Dkt. 129]. The party that invokes attorney-client privilege or work-product doctrine bears the burden of establishing the applicability of such privilege. Fed. R. Civ. P 26(b). Defendant did

not file a memorandum in support of its asserted privilege and the inapplicability of attorney client privilege as to the initial documents reviewed by the Court was patently obvious. [02/05/2020 hearing, at 16:11:30-16:13:40]. As such, the Court unsealed the documents and gave the parties until February 21, 2020 to supplement their summary judgment briefing and an additional week to decide whether discovery should be re-opened for the limited purposes of an additional deposition resulting from the unsealing of documents on the privilege log. *Id.* at 16:15:14-16:16:39; [Dkt. 130 (Courtroom Minutes of 02/05/2020 hearing)].

Both deadlines passed without filings from either party, including any requests for an extension. The Court considers the summary judgment briefing and discovery closed as of February 21, 2020, except for Defendant's reply brief. The Court declines to consider Plaintiffs' March 6, 2020 briefing [Dkt. 131 (Pl. Am. Mem. in Opp'n)] as untimely filed. The Court had already undertaken review of the parties' briefing by the time Plaintiffs' amended brief was belatedly filed. Moreover, the Court permitted supplementation pursuant to Fed. R. Civ. P. 56(d) upon the unsealing of the materials on the privilege log, but this was not an opportunity to reiterate arguments and evidence previously raised. Plaintiffs' new exhibit list does not appear to draw on any evidence from the Defendant's privilege log. [Dkt. 131 (Pl. Am. Mem. in Opp'n) Ex 2 (Exhibit list)]. Consequently, Plaintiffs' brief would not have changed the Court's decision had the Court considered it in depth.

The Defendant's reply [Dkt. 132 (Def. Repl. Br.)] to Plaintiff's opposition brief was timely filed because the Court stayed the deadline for filing the reply brief pending resolution of the discovery dispute [Dkt. 118]. The Defendant's reply

memorandum was filed on the fourteenth day following Plaintiff's opposition brief per D. Conn. L. R. Civ. P. 7(d).

## Background Facts

The following facts are taken from the Local Rule 56(a) statements of material facts and evidence cited by the parties.[1] The facts are undisputed unless otherwise noted. The facts are read in the light most favorable to the non-movants, Mr. Benitez and Mr. Rodriguez. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendant Jarvis Airfoil, Inc. is a manufacturing firm located in Portland, Connecticut. [Def. 56(a) ¶ 1]. Jarvis employed Plaintiff Gerry Benitez as a hand finisher beginning in October 2013. [Def. 56(a) ¶ 4]. Defendant employed Jose Rodriguez in the same facility as a machine operator beginning in March 2011. [Def. 56(a) ¶ 2]. Both plaintiffs are Hispanic males [Def. 56(a) ¶¶ 4-5] and both have dark skin [Pl. Ex. 1 (Benitez Aff.) ¶ 2]; [Pl. Ex. 2 (Rodriguez Aff. ¶ 3).

The harassment at issue is invocative of racial violence. It is highly disturbing and is not seriously contested by the Defendant. Although these facts are difficult, a detailed discussion is warranted to illustrate the work environment, which is central to the Court's reasoning.

---

[1] For ease of reference, exhibits will refer to evidentiary exhibits included with the Defendant's Motion for Summary Judgment [Dkt. 82] and Plaintiff's Opposition [Dkt. 82-83] by exhibit letter or number only. *i.e.* [Def. Ex.A] and [Pl. Ex. 1].

Citation to the Defendant's. D. Conn. Civ. L. R. 56(a)(1) statement is applicable where the parties agree as to the fact stated.

Mr. Benitez complained about the display of two nooses on the shop floor. Two photographs of the nooses as they appear in the work environment are included in Plaintiffs' opposition brief. [Pl. Exs. 18-19]. One noose is wrapped around the neck of a dark-skinned doll head; its face appears grimacing. (Pl. Ex. 19). The other appears life-size. [Pl. Ex. 18]. These images speak for themselves and will be filed with the Court's opinion. Defendant does not controvert the existence of the nooses. [Dkt. 70 (Def. Mem. in Supp. Mot. Summ. J.) at 11].

Mr. Benitez claimed that he was called a nigger by Jim Everitt, Fred Schiavone, Dave Jones, Bob Prince, Karl Theide, and Jeffery Suchoski. [Pl. Ex. 1 (Benitez Aff. ¶¶ 5-14)]; *See also* [Pl. Ex. 7 (Benitez Depo.) at 58:01-60:03, 62:09-62:17]. Jim Everitt, who was also a hand finisher [Def. Ex. 3 (Aff. DeLeon) ¶ 4], placed a white napkin over his head and cut eye holes into it, insinuating the Ku Klux Klan, and yelled "Toby" at Mr. Benitez. [Pl. Ex. 1 (Benitez Aff. ¶ 11]; *See also* [Pl. Ex. 7 (Benitez Depo.) at 59:18-60:06].[2] Mr. Everitt brought firearms and combat knives to work. [Pl. Ex. 7 (Benitez Depo.) at 60:04-64:20]. Mr. Benitez testified that he began feeling threatened by Mr. Everitt's continued display of knives after racial harassment continued and intensified. [Pl. Ex. 7 (Benitez Depo.) at 61:22-64:25] (using examples "rub-a-dub-dub, nigger" and "Get to work, nigger"). Mr. Everitt flashed Mr. Benitez with a revolver at work. [Pl. Ex. 1 (Benitez Aff. ) ¶ 10]; [Pl. Ex. 7 (Benitez Depo.) at 66:25-69:01]. Mr. Everitt stated to Mr. Benitez "Look what I got,

[2] In the Amended Complaint, Plaintiff asserts that "Toby" is a reference to the slave name of Kunta Kinte, a character in the miniseries "Roots." [Dkt. 42 (Am. Compl.) ¶ 23].

motherfucker." [Pl Ex. 7 (Benitez Depo.) at 67:10-67:15]. When Plaintiff Benitez asked him why he brought the revolver to work, he replied "you never know." *Ibid*.

On June 17, 2014, Mr. Benitez complained to Demetrius Willis, the first shift manufacturing supervisor, that his co-workers were making racially offensive comments and that a co-worker brought a weapon into the workplace. [Def. 56(a) ¶¶ 6-7]. Mr. Willis immediately informed manufacturing manager Phil Ozimek, who then informed human resources manager Jean Misorski. [Def. 56(a) ¶ 9-10]. Mr. Benitez was then placed on paid administrative leave while Jarvis undertook an investigation. [Def. 56(a) ¶ 11-12]. Defendant interviewed more than twenty employees, including Plaintiff Jose Rodriguez. [Def. 56(a) ¶ 12-14]. Plaintiffs contend that some employees were not cooperative. [Pl. 56(a)(2) ¶ 12]; [Def. Ex. 4 (Misorski Depo.) at 139:12:-139:17] (Q: "So a lot of these employees that were called in—and you mentioned some of them just didn't want to talk, they gave answers like, no, no or as the notes, reflect, unclear, because you couldn't even get a "no" out of them?" A: "That's correct.").

During the investigation, Plaintiff Jose Rodriguez reported being called a "fucking nigger" and an "LPN," stated that he also saw the two nooses, that Mr. Everitt showed him a gun part, and a different employee threatened that he would "put a cap in your ass an I'll blow (sic) your knee caps." [Def. 56(a) ¶ 16]. Mr. Rodriguez was unaware of Mr. Benitez's complaints until he was interviewed as part of the investigation. [Def. 56(a) ¶ 14]. Mr. Rodriguez avers that "LPN" means "left-handed Puerto Rican nigger" or "left-handed Polish nigger." [Pl. Ex. 2 (Rodriguez Aff.) ¶ 9]. Mr. Benitez's affidavit explains that the acronym, as used by

Mr. Suchoski and Mr. Theide, means "Latino or Puerto Rican, still a nigger." [Pl. Ex. 1 (Benitez Aff.) ¶ 18].

The parties agree that Defendants issued warnings to Bob Prince, Fred Schiavone, Jr., Karl Thiede, and Jeff Suchoski following the investigation. [Def. 56(a) ¶ 17]; [Pl. 56(a)(2) ¶ 17]. However, Plaintiffs dispute whether Mr. Everitt and Mr. Prince were suspended without pay. [Pl. 56(a)(2) ¶ 17].

The document cited by Plaintiffs [Pl. Ex. 5 (Rodriguez notes) at ROD 0011] states "09/08/14 James Evertt (sic) told me John gave him 4 week (sic) off w/ pay". The document production did not include a written warning issued to Mr. Everitt. Ms. Misorski testified that Mr. Everitt and Mr. Prince were suspended for a month and "a week or two," respectively [Def. Ex. C (Misorski Depo.) 152:06-152:12]. When asked if there was a memorialization of the suspensions, Ms. Misorski gave inconsistent answers about the documentation that was provided but implied that the suspensions were unpaid. [Def. Ex. C (Misorski Depo.) 154:08-157:14].

The written warning for Mr. Prince does not state that he has been suspended. [Def. Ex. G (06/25/2014, Prince Final Warning) at JAR 000166-67]. Notably, the Defendant's Rule 56 statement does not state the duration of Mr. Prince's suspension. [Def. 56(a) ¶ 17].

There is, however, another material uncontroverted fact concerning employees' discipline: none of the offending employees were terminated as a consequence of the investigation, which substantiated Plaintiffs' allegations. Additionally, David Jones, who displayed the noose pictured in Pl. Ex 19 at his

workstation was not disciplined at all. [Pl. Ex. 1 (Benitez Aff.) ¶ 7]; [Pl. Ex. 7 (Benitez Depo.) at 85:15-85:22]. Ms. Misorski was aware that Mr. Jones admitted to having the "noose doll" for six months to a year, or perhaps longer. [Pl. Ex. 4 (Misorski Depo.) 137:15-137:20].

At the conclusion of the investigation, Ms. Misorski contacted Mr. Benitez to offer him the following options: (1) return to work to his original position or (2) transfer to another facility, Jarvis Polishing, which is located in Bristol, Connecticut. [Def. 56(a) ¶ 17]. Jarvis also argues that Ms. Misorski offered him the option of moving to a nickel polishing area. [Def. 56(a) ¶ 18]. Mr. Benitez previously worked at the Bristol facility roughly thirteen years earlier. [Pl. Ex. 8 (Benitez Empl. App.)]; [Pl. Ex. 7 (Benitez Depo.) at 18:07-18:19]. Mr. Benitez testified that he told Ms. Misorski that he declined the transfer option because employees from Jarvis Airfoil would deliver parts to the polishing facility and the couriers were friendly with the harassers. [Pl. Ex. 7 (Benitez Depo.) at 94:02-95:02]. Ms. Misorksi offered him the option to move to second shift, but the shifts overlapped. [Pl. Ex. 7 (Benitez Depo.) at 95:06-95:12]. Mr. Benitez testified that he did not return to Jarvis Airfoil because he was afraid of retribution.  [Pl. Ex. 7 (Benitez Depo.) at 91:10-92:23].

The parties dispute whether there was training following the conclusion of Defendant's investigation into Mr. Benitez's complaints. [Def. 56(a) ¶ 60]; [Pl. 56(a)(2) ¶ 60]. The deposition excerpts cited by Defendant show that the staff meeting was held in October 2014. [Def. Ex. E (DeLeon Depo.) at 77:03-77:25]. However, Ms. DeLeon testified that Defendant instituted policy changes in 2016 or 2017, after Plaintiffs left employment. [Def. Ex. E (DeLeon Depo.) at 99:02-99:02-25].

The formal training records show that it took place on January 27, 2016. [Pl. Ex. 23 (Training Record)]. Karl Theide's disciplinary report states that "Sensitivity Training sessions will take place during the month (sic) of July and August," but it is unclear whether they occurred at all. [Def. Ex. G (06/27/2014, Theide Warning) JAR000165]; [Def. Ex. 22 (Teller Depo.) 89:14-90:10]. Defendant has not made any assertions about the scope of the anti-discrimination or harassment training provided prior to October 2014, if any.

Mr. Rodriguez remained employed by Jarvis for eighteen months after Mr. Benitez resigned. [Def. 56(a) ¶¶ 2, 21]. Ms. Misorski provided Mr. Rodriguez with her email address and told him to contact her with any concerns, but Mr. Rodriguez did not do so. [Def. 56(a) ¶¶ 61, 63]. After the investigation, Mr. Rodriguez reported that an unidentified caller contacted him, called him a "snitch," then hung up. [Def. 56(a) ¶ 62]. Another incident involved an employee throwing a silicone ball at Mr. Rodriguez and Tin Khner. [Def. 56(a) ¶ 62].

In August of 2014, roughly two months after the Benitez investigation, Mr. Rodriguez began maintaining a personal log of work events, sometimes emailing it to his lawyer. [Def. 56(a) ¶ 67]. The log, Pl. Ex. 5, encompasses 145 pages. It was never shown to Defendant. [Def. 56(a) ¶ 68]. On October 6, 2014, Stella Teller, who replaced Ms. Misorski, presented employees with information about a new policy on harassment and bullying. [Def. 56(a) ¶ 69-70]

Two weeks later, Mr. Rodriguez complained to Ms. Teller, although the parties dispute the content of the conversation [Def. 56(a) ¶¶ 65-66, 69, 71]; [Pl.

56(a)(2) ¶ 66]. Plaintiff claims that he was being ostracized by co-workers [Pl. Ex. 2 (Rodriguez Aff.) ¶ 28], whereas Defendant argues that Mr. Rodriguez's complaint concerned an employee who would not share donuts [Def. 56(a) ¶ 66].

The parties also dispute whether Mr. Rodriguez complained later. Mr. Rodriguez's affidavit states that he went to Ms. Teller's office to complain about racial harassment again on October 29, 2014 [Pl. Ex. 2 (Rodriguez Aff.) ¶ 28], whereas Defendant argues that Mr. Rodriguez's last complaint was on October 24, 2014 [Dkt. 70 (Def. Mem. in Supp. Mot. for Summ. J.) at 16]. *But see* [Pl. Ex. 5 (Rodriguez log, 11/18/2014 email to counsel) ROD0045]("On 10/29/14 @ 9:30am I went to complain to (HRM) Stella about bullying & Racial Slur (sic) issues that were still occurring on the shop floor. I only spoke to her about Jeffery suchoski (sic), Josph (sic)Finta & Scott Norma….. (sic) to Be out of her office quick and not be seen by other Employees (sic).").

Mr. Rodriguez alleges that harassment continued, including an instance of threatened violence by Edward Heinz, and continued references to nooses; however, none of this harassment is alleged to have been reported to management. [Pl. 56(a)(2) Additional Material Facts ¶¶ 35-37]. He alleges that Mr. Ozimek called him a "fucking ant" during Defendant's Thanksgiving dinner. [Def. Ex. 70 (Rodriguez Depo.) at 232:15-234:05]. Mr. Ozimek denies making the comment. [Def. 56(a) ¶ 49].

Mr. Rodriguez was subjected to additional scrutiny from Jason Jarvis and the new manufacturing manager, Haitham Taha. [Pl. 56(a)(2) Additional Material

Facts ¶¶ 38-39]. He sustained a workplace injury but asserts that he was treated differently than Mr. Everitt who also sustained a workplace injury. [Pl. 56(a)(2) Additional Material Facts ¶ 40]. He was disciplined for refusing to operate an unsafe machine in January 2016 [Pl. 56(a)(2) Additional Material Facts ¶ 40] and resigned later that month. [Def. 56(a) ¶ 2].

## Legal Standard for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255; *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not

sufficient.") (citing *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

Discussion

I.    Parties' Arguments

Jarvis raises three arguments in support of its motion for summary judgment on all claims. First, Jarvis argues that it is not vicariously liable for the unlawful or inappropriate acts of its employees because Plaintiffs cannot show unlawful acts by Jarvis's managerial personnel or that they had knowledge of the discriminatory behavior prior to Mr. Benitez's formal complaint in June 2014. [Dkt 70 (Def. Mem. in

Supp. Mot. Summ. J.) at 5-17]. Jarvis argues that it conducted a thorough investigation and instituted appropriate remedial measures. [*Id.* at 10-17].

On the individual claims, Jarvis argues that Mr. Benitez cannot satisfy the demanding standard of intolerability or deliberate intent to establish constructive discharge, given Jarvis's proposed alternative work arrangements. [*Id.* at 17-21]. Jarvis argues that Mr. Rodriguez did not participate in protected activity [*Id.* at 22-23], that Jarvis never took materially adverse action against him [*Id.* at 23-24], and there is no causal connection between a short-term layoff and his purported protected activity [*Id.* at 24-25].

In opposition, Plaintiffs argue that they made prior complaints that went unaddressed [Dkt. 82 (Pl. Mem. in Opp'n.) at 2]. Plaintiffs argue that there is a factual dispute about whether management knew about the harassment prior to Mr. Benitez's complaint in June 2014. [*Id.* at 3-4]. Plaintiffs argue that a supervisor, who was later rehired as an assistant, engaged in racial harassment as far back as 2011. [*Id.* at 4]. Mr. Benitez argues that, given his psychological state, he could not have gone back to work for Jarvis. [*Id.* at 4]. Mr. Rodriguez argues that he engaged in protected activity by complaining about conduct that was directed at him personally and that Jarvis failed to institute measures to protect him from retaliation and further harassment. [*Id.* at 5].

The Court agrees with the Plaintiffs. Because the Court concludes that there are genuine disputes of material fact concerning Jarvis's liability for co-worker harassment and there are genuine issues of material fact as to the appropriateness

and adequacy of Jarvis's response to the complaints of harassment, the Court did not separately analyze whether Plaintiffs' claims arising from supervisory harassment survive summary judgment.

## II.     Racial Discrimination under § 1981 generally

For purposes of Defendant's motion, there are no relevant differences between § 1981 of the Civil Rights Act of 1866 and Title VII.[3] Claims of a hostile work environment and constructive discharge on account of race are actionable under § 1981. *Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 68-69, n.5 (2d Cir. 2000). To prevail on the harassment claim, Plaintiffs must not only show that it was "severe or pervasive" but also "a specific basis for imputing the conduct that created the hostile environment to the employer." *Id*. at 72 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d.Cir. 1996)).

Mr. Rodriguez's § 1981 retaliation claim is analyzed under Title VII's familiar *McDonnell Douglas* burden shifting framework. *Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d. Cir. 2015); *Little v. Ne. Utilities Serv. Co*., 299 F. App'x 50, 52 (2d Cir. 2008).

## III.     Hostile Work Environment

---

[3] Unlike Title VII, a plaintiff pursuing a claim under  § 1981 must show intentional discrimination, whereas a Title VII claim can be established through proof of negligence in some circumstances, such as disparate impact. *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (noting differences between the statutes).

A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). The conduct must be "severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (internal quotation marks and citation omitted). "[W]hether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997). Determining whether an environment is hostile and abusive considers the totality of the circumstances, including whether it is physically threatening and the effect on the employee's psychological well-being. *Harris*, 510 U.S. at 23.

Here, Jarvis has not challenged the factual or legal basis of Plaintiffs' claims of co-worker harassment. Jarvis instead argues that it cannot be held liable for co-worker harassment. [Dkt. 132 (Def. Repl. Br.) at 1, n.1].

## II. Employer Liability for Co-Worker Harassment

Jarvis cites *Vance v. Ball State Univ.*, 570 U.S. 421 (2013) for the proposition that if the harasser is a co-worker and not a supervisor, an employer is liable only if it was negligent in controlling the working conditions. [Dkt. 70 (Def. Mem. In Supp.

Mot. Summ. J.) at 6-7]. To establish negligence, the fact finder must consider whether (1) the employer "failed to provide a reasonable avenue for complaint" or (2) "it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d. Cir. 2000).

Jarvis argues that it provided employees with a reasonable avenue for complaint as evidenced by Mr. Benitez's June 17, 2014 complaint to his supervisor, Mr. Willis, who reported it up the chain to Mr. Ozimek, who then reported it to Ms. Misorski. [Dkt. 70 (Def. Mem. in Supp. of Mot. Summ. J.) at 9-10]. The Court agrees.

Jarvis avers that it did not know of the racial harassment until Mr. Benitez's report, and then instituted prompt remedial measures. The Court disagrees. Here, summary judgment is precluded because there are genuine disputes of material fact about whether Jarvis knew or should have reasonably known of the harassment prior to Mr. Benitez's complaint in June 2014. *See Torres v. Pisano*, 116 F.3d 625, 634 (2d Cir. 1997). Even if Jarvis first learned of the racial harassment in June 2014, summary judgment is also precluded because a reasonable jury could find that Jarvis failed to take appropriate remedial action, both with respect to the discipline of the perpetrators and because Jarvis adversely effected the conditions of employment of the complainant by suspending him, offering him a palliative transfer, and then offering him a less desirable second shift.

First, there is a genuine dispute of material fact about whether Mr. Benitez previously complained to Mr. Willis. Plaintiffs argue that Mr. Benitez complained to

Mr. Willis about racial harassment on two instances prior to June 17, 2014. [Pl. 56(a)(2) ¶ 56]. Mr. Benitez testified that he complained to Mr. Willis about harassment, the nooses, and people bringing weapons to work in April and "maybe March" of 2014 [Pl. Ex. 7 (Benitez Depo.) 63:18-66:24]; *see also* [Pl. Ex. 1 (Benitez Aff.) ¶¶ 16-17].

In response to Mr. Benitez's complaints and showing him a noose, Mr. Benitez testified that Mr. Willis was angry and told him to "lay low and do your work or else" and that Mr. Benitez was going to "skin (sic) this whole company." [Pl. Ex. 7 (Benitez Depo.) 64:21-66:18]. Mr. Willis denies knowledge of the nooses or any harassment prior to Mr. Benitez's June 17, 2014 complaint. [Def. 56(a) ¶¶ 29-30, 56].

Jarvis argues that, even if Mr. Benitez's claim is true, Mr. Willis's knowledge cannot be imputed to Jarvis because Mr. Willis is not vested with the authority to deem him a corporate proxy. [Dkt. 70 (Def. Mem. in Supp. Mot. Summ. J.) at 11]. This argument fails in two respects.

Plaintiff cites *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708 (2d. Cir. 1996) for the proposition that a low level supervisor's knowledge of a hostile work environment cannot be imputed to the employer. [Dkt. 70 (Def. Mem. in Supp. Mot. Summ. J.) at 12]. However, as the Second Circuit later explained in *Torres v. Pisano*, knowledge will be imputed "where the person who gained notice of the harassment was the supervisor of the harasser (e.g., had the authority to hire, fire, *discipline*, or transfer him), knowledge will be imputed to the employer on the ground that the employer vested in the supervisor the authority and the duty to terminate the

harassment." *Torres*, 116 F.3d at 637 (citations omitted)(emphasis added). Jarvis avers that Mr. Willis's role was essentially a production foreman, tasked with maintaining the shop floor. [Def. 56(a) ¶ 57]. Here, Plaintiffs argue that all of the warnings issued to the harassers were signed by Mr. Willis as their supervisor. [Pl. 56(a)(2) response ¶ 57]; [Pl. Ex. 21 (JAR 000164-68)]; *see also* [Pl. Ex. 20 (Jarvis Org. Chart) JAR 000001](showing Mr. Willis as the supervisor for thirty seven employees including: Messrs. Everitt, Jones, Prince, Theide, and Plaintiffs). Since Plaintiffs can show that Mr. Willis had the power to discipline the alleged harassers, Mr. Willis's knowledge can be imputed back to Jarvis. *Torres*, 116 F.3d at 637.

In addition to the claim that Mr. Willis had direct, personal knowledge of the racial harassment because of Mr. Benitez's prior complaints, Plaintiffs also allege that other managers, including Mr. Willis's boss, Mr. Ozimek, and the HR manager, Ms. Misorski, had constructive knowledge of the nooses. Plaintiffs argue that management would walk past these displays at Mr. Jones's and Mr. Prince's workstations. [Pl. Ex. 1 (Benitez Aff.) ¶ 9]; *but see* [Def. 56(a) ¶ 34](admitting that Misorski did not see the nooses until Benitez complained in June 2014)]. The Court agrees that there is a genuine issue of material fact about whether Mr. Ozimek knew of the nooses prior to June 2014. Mr. Ozimek denied that he saw the nooses. [Pl. Ex. 17 (Ozimek Depo.) at 77:09-77:25]. However, Mr. Ozimek visited the polishing department on a daily basis and had conversations with Mr. Jones at his workstation where the noose around the doll's neck was displayed atop his work lamp. [*Id.* at 78:18-79:17]. Mr. Ozimek testified that he noticed family photographs at employee's workstations but did not see the doll head. [*Id.* at 79:04-79:17].

The Court notes that the images of both nooses show them being displayed openly, rather than in a closed container, draw, or closet, and one of them was life-sized. [Pl. Ex. 18-19]. Such a flagrant display, apparently for an extended period of time, [Pl. Ex. 4 (Misorski Depo.) 137:15-137:20], casts doubt on Mr. Ozimek's testimony. It necessitates a credibility determination, which is the province of the jury. *Proctor v. LeClaire,* 846 F.3d 597, 608 (2d Cir. 2017).

Consequently, aside from the factual dispute over whether Mr. Willis had direct knowledge of the racial harassment and the nooses, there is also a genuine dispute of material fact over whether Mr. Ozimek also had knowledge of the nooses prior to June 2014. Because there is a genuine factual dispute about whether Jarvis actually knew about the racial harassment prior to June 2014, the Court declines to consider alternative theories of proof, such as constructive knowledge. *See Torres*, 116 F.2d at 634, n. 9.[4]

Even if Jarvis had knowledge of harassment, it may avoid liability by showing that it took reasonable steps to remedy the harassment. As the Second Circuit explained in *Snell v. Suffolk Cty.*, 782 F.2d 1094, 1104 (2d Cir. 1986):

> It may not always be within the employer's power to guarantee an environment free from all bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy.... But once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with discriminating on the basis of race.

(quoting *DeGrace v. Rumsfeld*, 614 F.2d 796, 803 (1st Cir.1980)).

---

[4] Absent from either parties' briefing is any discussion of pre-complaint efforts to prevent or reduce the risk of racial harassment or discrimination, if any.

Jarvis argues that it took prompt disciplinary measures after Ms. Misorski determined that "inappropriate conduct by several of Plaintiffs' co-workers had taken place." [Dkt. 70 (Def. Mem. in Supp. of Mot. Summ. J) at 13]. In a footnote, Jarvis explains that while the investigation revealed that several co-workers had acted inappropriately towards Mr. Benitez, Ms. Misorkski concluded that the harassment was motivated by long-time Jarvis employees who were upset that Mr. Benitez was earning a higher wage on account of his higher skill level and not racially motivated. [Dkt.70 (Def. Mem. in Supp. of Mot. Summ. J) at 13, n.8]. This explanation is clearly subject to question in light of the objective manifestations of racial animus. The history of racial violence in this nation and the centuries-old tradition of lynching atrocities call that characterization into sharp question. The psychological motivation for racial harassment, be it envy or personal bigotry, is immaterial. Ms. Misorkski corroborated the existence of the nooses and Walter Mueller corroborated that Mr. Everitt called Mr. Benitez a nigger. [Pl. Ex. 10 (Typed Investigation notes, 6/18/14 2:30 P.M.) JAR 000110)]; [Pl. Ex. 4 (Misorski Depo.) 137:15-137:20]. These invectives were accompanied by displays of lethal weapons in the workplace.

To determine whether Jarvis's response was reasonable, the Court considers the gravity of the harm, the nature of the work environment, and the resources available to the employer. *Snell*, 782 F.2d at 1104. Jarvis's analogy to the remedial measures undertaken in *Rios v. Buffalo & Fort Erie Pub. Bridge Auth.*, 326 F. App'x 612 (2d Cir. 2009) is distinguishable. First, the plaintiff in *Rios* could not establish a severe and pervasive environment to survive summary judgment

because she relied on six instances over the period of thirteen years and no single instance was severe enough to alter the terms and conditions of her employment. *See Rios v. Buffalo & Fort Erie Pub. Bridge Auth.,* No. 04-CV-375A, 2008 WL 657121, at *3 (W.D.N.Y. Mar. 7, 2008).

Second, and more importantly, in *Rios* the employer did not know who authored the two offensive cartoons, despite extensive investigations. *Id.* at 6-7. It nevertheless immediately sent out memorandums reiterating its anti-harassment policy and conducted daily rounds to search for inappropriate material. *Ibid.*

Unlike *Rios*, the identity of the harassers was known to Jarvis. Jarvis confirmed that both Mr. Jones and Mr. Prince had nooses displayed at their workstations, yet Mr. Jones was not disciplined at all. [Pl. Ex. 1 (Benitez Aff.) ¶ 7]; [Pl. Ex. 7 (Benitez Depo.) at 85:15-85:22]; [Pl. Ex. 4 (Misorski Depo.) 137:15-137:20]. Mr. Prince was suspended for "a week or two." [Def. Ex. 3 (Misorski Depo.) 152:06-152:12]. Jarvis confirmed that Mr. Everitt brought a gun to work [Def. Ex. 83 (Investigation Notes, 618/14 2:30 P.M. Paul Naumec) JAR 000149] and Mr. Benitez reported that he used it to intimidate him [Def. Ex. 3 (Willis 07/03/2014 email to Misorski)]. No one was terminated. Moreover, the regularly maintained personnel records do not document the claimed discipline. The absence of such records is of evidentiary significance and calls the adequacy of the discipline imposed in question. Fed. R. Evid. 803(7)

Unlike *Rios*, Plaintiffs presented evidence that Jarvis simply ignored the offending behavior; first when Mr. Willis told Mr. Benitez to "lay low" after he

complained twice, [Pl. Ex. 7 (Benitez Depo.) 64:21-66:18] and then again when it failed to sufficiently discipline the harassers or follow through on assigned remedial training. Plaintiff's credibly challenge the depth of the investigation as several employees were uncooperative, apparently without repercussion. [Def. Ex. 4 (Misorski Depo.) at 139:12-139:17]. Other than reviewing policies in October 2014 (three or four months after Benitez's complaint), the only other training took place over eighteen months later, notwithstanding the fact that Mr. Theide's disciplinary action states that there will be multiple remedial training sessions within two months. [Def. Ex. E (DeLeon Depo.) at 77:03-77:25]; [Def. Ex. G (06/27/2014, Theide Warning) JAR000165]; [Def. Ex. 22 (Teller Depo.) 89:14-90:10]; [Pl. Ex. 23 (Training Record)].

Defendant quotes footnote 7 of *Torres v. Pisano*, 116 F.3d at 632 stating: "Title VII does not require that an employer fire all of the 'Archie Bunkers' in its employ." [Dkt. 70 (Def. Mem. in Supp. Mot. Summ. J.) at 14]. The quotation is erroneously punctuated and the relevant material was omitted, resulting in a false statement of the law. This is further evidenced by Defendant's reply brief, which again alters the quotation to omit the relevant portion. [Dkt. 132 (Def. Repl. Br.) at 5]. The implication is disconcerting as the Code of Professional Conduct requires candor to the tribunal. Rules of Professional Conduct 3.3. The full quotation reads:

> "'[W]hile Title VII does not require that an employer fire all "Archie Bunkers" in its employ, the law does require that an employer take prompt action to prevent such bigots from expressing their opinion in a way that abuses or offends their co-workers.'"

*Torres*, 116 F.3d at 633 (2d Cir. 1997) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 350 (6th Cir. 1988) (underline added to emphasize omitted language)

The Sixth Circuit in *Davis* explained this now-dated and complicated[5] popular culture reference in detail. 858 F.2d at 350. Citing to *Howard v. National Cash Register Co*, 388 F.Supp. 603, 606 (S.D. Ohio 1975), *Davis* explained " 'Archie Bunker' is a character who is prejudice and biased against all persons other than his own neighborhood, religion, and nationality..." but the district court may be erroneously encouraging the perpetuation of the status quo." *Davis*, 858 F.2d. at 350. It is the latter part of the quotation that is instructive. The law does not require employers to terminate curmudgeons or those who harbor private prejudices that never manifest. The law requires employers to take prompt and appropriate measure to prevent "such bigots from expressing their opinion in a way that abuses or offends their co-workers." *Ibid*. Because Plaintiffs present credible evidence that Jarvis failed to do just that, even after corroborating Plaintiffs' allegations, the materiality of the omitted portion of the quotation is clear and summary judgment as to Count 1 must be denied.

Suffice it to say, Jarvis's decision to alter the terms and conditions of the complainant's employment adversely by first suspending him instead of the alleged perpetrators of flagrant and blatantly racial and lethally threatening

---

[5] *All in the Family*, (CBS television broadcast 1971-78); *See also* Sascha Cohen, *How Archie Bunker Forever Changed the American Sitcom*, SMITHSONIAN MAGAZINE (Mar. 21, 2018) ("The dilapidated aesthetic mirrored Archie's character traits; he was retrograde, incapable of dealing with the modern world, a simpleton left behind by the social upheavals of the 1960s and 1970s, a pathetically displaced "historical loser." Lear used him as a device to make racism and sexism look foolish and unhip, but liberals protested that as a "loveable bigot," Archie actually made intolerance acceptable. Lear had intended to create a satirical and exaggerated figure, what one TV critic called "hardhat hyperbole," but not everyone got the joke.").

harassment could be found inadequate by a reasonable jury. Further, after determining his complaint was valid, Jarvis proposed to permanently alter the conditions of his employment adversely by giving him two untenable options, first, a palliative transfer to a location where he previously worked, but did not ask to be transferred, and then a less desirable second shift position. These options could clearly be viewed as an inappropriate remedial action by a reasonable jury. *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d. Cir. 2000).

## II. Constructive Discharge as to Mr. Benitez

A constructive discharge typically arises when an employer intentionally creates an intolerable work atmosphere that forces an employee to quit voluntarily. *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)(citing to *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)). "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee*, 222 F.3d. at 73. "A claim for constructive discharge requires the plaintiff to prove that her employer deliberately and discriminatorily created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir.2006) (emphasis added) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)). In *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d at 74, the Second Circuit recognized that the deliberateness standard was not thoroughly defined, but held that "something beyond mere negligence or ineffectiveness is required."

Here, Mr. Benitez testified that he was crying when he reported the harassment to Mr. Willis for the third time. [Pl Ex. 7 (Benitez Depo) at 76:08-76:15]. The racial harassment and intimidation was flagrant. Mr. Everitt, the principle harasser, brought a gun to work and made a thinly veiled threat of physical violence. Despite this, he was not terminated, nor were the employees who hung the nooses. Rather, the employer concluded that his co-worker's "inappropriate conduct" was motivated by envy rather than racial bias. A reasonable jury could find that the refusal to undertake protective measures amounted to a deliberate effort to compel his resignation.

At that juncture, Mr. Benitez had been treating with a therapist, Adrienne Benjamin, LCSW, who recommended that he not return to work because of the weapons being brought there and diagnosed him with anxiety and depression. [Pl. Ex. 7 (Benitez Depo.) at 95-96]; [Pl. Ex. 2 (Benitez Aff.) ¶¶ 19-20].

Given the totality of the circumstances, the Court concludes that a reasonable jury could find that Mr. Benitez's fear of violent retribution rendered the conditions so difficult or unpleasant that a reasonable person in his shoes would have felt compelled to resign by Jarvis's action. A reasonable jury could find that the proposed accommodations amounted to his employer's demand that he substantially alter the terms and conditions of his work environment to accommodate his harassers. By declining to terminate the harassers, a jury could find that Mr. Benitez was deliberately left with a Hobson's choice arising from an unreasonable safety risk. *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) ("A constructive discharge may be found on the basis of evidence that

an employer deliberately sought to place an employee in a position that jeopardized his or her health.").

It is for the jury to weigh whether Mr. Benitez's failure to respond to Ms. Misorski's offer for Mr. Benitez to propose accommodations undermines the Hobson's choice that Mr. Benitez's testimony suggests. *See* [Def. 56(a) ¶ 19].

Therefore, the Court DENIES summary judgment as to Count 2 for constructive discharge.

IV.     <u>Retaliation as to Jose Rodriguez</u>

To establish a prima facie case of retaliation, Mr. Rodriguez must show: "(1) that [he] participated in a protected activity, (2) that [he] suffered an adverse employment action, and (3) that there was a causal connection between [his] engaging in the protected activity and the adverse employment action." *Rasmy v. Marriott Int'l, Inc.*, No. 18-3260-CV, 2020 WL 1069441, at *8 (2d Cir. Mar. 6, 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).

First, Jarvis argues that Mr. Rodriguez's statements during the Benitez investigation cannot constitute protected activity because the participation clause of Title VII only applies to formal state or administrative proceedings. [Dkt. 70 (Def. Mem. in Supp. Mot. Summ. J) at 22]. The Court agrees that the participation clause is inapplicable, but Mr. Rodriguez can establish that he engaged in protected activity under the opposition clause. Mr. Rodriguez's argument falls squarely within the controlling precedent, *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271 (2009). In *Crawford*, the U.S. Supreme Court rejected the

argument that an employee must instigate an investigation to fall within the ambit of Title VII's opposition clause. *Ibid*. Since the term "oppose" was undefined by the statute, *Crawford* held that any activity designed "to resist or antagonize ...; to contend against; to confront; resist; [or] withstand" discrimination prohibited by Title VII constitutes a protected oppositional activity. *Crawford*, 555 U.S. at 276; *see also Littlejohn*, 795 F.3d. at 317. "When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication" virtually always "constitutes the employee's opposition to the activity." *Crawford*, 555 U.S. at 276 (quoting 2 EEOC Compliance Manual §§ 8–II–B(1), (2), p. 614:0003 (Mar.2003)).

Jarvis argues that Mr. Rodriguez did not "oppose" unlawful practices because "the only source of Rodriguez's complaints stemmed from the information learned in the Benitez Investigation." [Dkt. Ex. 70 (Def. Mem. in Supp. Mot. Summ. J.) at 23]. However, the facts show that Mr. Rodriguez corroborated Mr. Benitez's allegations and presented new information about harassment directed towards him personally. *See* [Def. 56(a) ¶ 16].

Mr. Rodriguez need not separately initiate an internal investigation to come within the opposition clause of Title VII. That exact argument was rejected by the U.S. Supreme Court in *Crawford*: "There is, then, no reason to doubt that a person can "oppose" by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a

question." 555 U.S. at 277–78 (2009). Defendant does not cite *Crawford* or explain how it is inapplicable to the facts here.

Defendant admitted Mr. Rodriguez reported being called a "fucking nigger," that he saw the two nooses, and reported that a different employee threatened to shoot him. [Def. Ex. 56(a) ¶ 16]. As a matter of law, Mr. Rodriguez engaged in a protected activity when he opposed discrimination by reporting racial harassment during the investigation into Mr. Benitez's allegations.

Whether Mr. Rodriguez suffered a materially adverse employment action is a more difficult issue. To constitute an adverse action, Plaintiff must show that "a reasonable employee would have found the employer's challenged action materially adverse, i.e. that the challenged action would well dissuade [a] reasonable employee from protected conduct." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). This is an objective standard. *Id*. at 68-69. "[T]he standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *Id*. at 69.

In order to establish a retaliatory hostile work environment, Mr. Rodriguez must satisfy the same standard governing hostile work environment claims. *See Senior v. Connecticut Workers' Comp. Comm'n, Third Dist*. No. 3:17-CV-1205 (JBA), 2018 WL 4288643, at *4 (D. Conn. Sept. 7, 2018). Similarly, an employer must know about retaliatory harassment, but fail to act. *Antonopoulos v. Zitnay,* 360 F. Supp. 2d 420, 428 (D. Conn. 2005).

The evidence is conflicting. Mr. Rodriguez reported that an anonymous caller called him a snitch. [Def. 56(a) ¶ 62]. While Jarvis argues that Mr. Rodriguez did not take any steps to ascertain the identity of the caller, it does not suggest what steps could have been undertaken by Mr. Rodriguez. [Def. 56(a) ¶ 62]. Certainly, based on the reported anonymous call alone, Jarvis could have instructed employees that retaliation would not be tolerated. Additionally, Mr. Rodriguez testified that Mr. Ozimek, his supervisor's manager, called him a "fucking ant." [Def. Ex. 70 (Rodriguez Depo.) at 232:15-234:05]. On the basis of these facts, a reasonable jury could conclude the perpetrators of the harassment against Benitez believed Rodriquez provided information to substantiate Benítez's claim and retaliated against him or participating in the investigation. This is made more likely by the fact that many employees refused to participate and both men were brown-skinned Latinos.

His sworn affidavit references continued mocking comments about a noose in Mr. Rodriguez's presence, this time referencing Mr. Willis, who is black. [Pl. Ex. 2 (Rodriguez Aff.) ¶¶ 31-32). The conduct need not be directed at Plaintiff to constitute a hostile work environment. *Rasmy v. Marriott Int'l, Inc.*, No. 18-3260-C. V, 2020 WL 1069441, at *5-6 (2d Cir. Mar. 6, 2020). Mr. Rodriguez argues that he attempted to report this information to management but reports of racial slurs were rebuffed by Ms. Teller. [Pl. Ex. 2 (Rodriguez Aff.) ¶ 28]. Conversely, Jarvis established that Ms. Misorski provided Mr. Rodriguez with her email and that Mr. Rodriguez did not show anyone at Jarvis his diary of events; instead he emailed it

to his attorney. [Def. 56(a) ¶¶ 63, 68]. This necessarily implicates a credibility determination, which is the province of the jury.

Accordingly, summary judgment as to Count 3 is also DENIED.

<u>Conclusion</u>

For the aforementioned reasons, the Court DENIES Defendant's motion for summary judgment in its entirety.

The Court has set a jury selection date of August 18, 2020. [Dkt. 127 (Trial Scheduling Order)]. At the commencement of trial, the case will have been pending for over four years and over six years past many of the events at issue. The trial schedule provides the parties for amble time to prepare, including participation in a settlement conference, if they are so inclined. The Court expects the parties to proceed with trial without any undue delay.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: March 30, 2020